[Crim. No. 1119. Fourth Dist. May 13, 1957.]

THE PEOPLE, Respondent, v. RAYMOND A. RUSSELL,
Appellant.

William W. Shaw for Appellant.

No appearance for Respondent.

BARNARD, P. J.—The defendants Russell and Shear were jointly charged with a violation of section 470 of the Penal Code (forgery). A jury found them both guilty and Russell's motion for a new trial was denied. Judgment was pronounced sentencing Russell to state prison, the sentence being suspended and probation granted to him. In addition to the usual and ordinary terms of probation he was ordered to pay a fine of $1,000 at the rate of $25 per month. He has appealed from the judgment and from the order denying his motion for a new trial.

There is no dispute as to the general facts involved. One Curtis Hight was an engineer working in various oil fields throughout the world, including Saudi-Arabia. He maintained a bank account in Riverside and returned there from Saudi-Arabia in February, 1954. Shortly thereafter, he bought a used car from the defendant, Abe Shear, a used car dealer in Riverside, paying for it with a check. Thereafter, he frequently dropped in at Shear's place and chatted with him. He told Shear about his business trips and, later in May, told Shear that he was leaving soon for a protracted visit to

Ethiopia. About that time, Shear cashed a check for $2.50 for Hight.

The defendant Russell was a private investigator in Riverside. As a part of his business he also operated a patrol service. He had a contract with Shear to patrol Shear's place of business, and one of his employees, Andrew Cocas, did the actual patrolling. Russell did not know Hight.

Around the 8th or 10th of June, 1954, Russell and Cocas went into the Riverside postoffice and accidentally met Shear. Shear called Russell aside and showed him a check for $884.59 purportedly signed by Hight, and payable to cash. Shear told Russell that he could not run this check through his own bank account because the tax officials would think it was a car deal and charge him sales tax on it; and he offered Russell half the proceeds of the check if Russell would run it through his own bank account. Cocas saw Shear hand Russell the check but did not hear the conversation. Russell then discussed the transaction with Cocas and offered to let Cocas handle the matter, but Cocas refused, saying that the deal ''smelled.''

Shear told Russell that Hight would be out of town, and told him to hold the check for a few days. Some 10 days later Shear told Russell over the telephone that the check was good, and told him to call the bank and confirm it. Russell called the bank and was told that such a check would be good. Russell then placed his business endorsement stamp on the back of the check, deposited the check to his own account in another bank, and his account was credited with that amount. The next day Shear phoned Russell and told him not to deposit the check, explaining that Hight had come back to town. When Russell told him he had already deposited the check Shear told him he had better leave the money there for two months ''just in the event there is some trouble.''

Hight had returned from Ethiopia sooner than he had indicated to Shear, and the cancelled check in question was returned to him by his bank. He referred the matter to the authorities and the matter was investigated. It was found that the forged check was made out on a typewriter belonging to Shear, and the check had been torn out of a book of checks found in Shear's office. It was established that the signature on this check had been traced from the signature on the $2.50 check given to Shear by Hight.

While no question exists as to the proof of forgery and Shear's connection with it, the appellant's sole contention is that the evidence was insufficient to show any criminal act,

knowledge or intent on his part in connection with issuing or passing this forged check. It is argued that Shear had told him that the check was good, and he had no basis for disbelieving him; that at Shear's insistence he called the bank and found out the check was good; that the fact that Cocas thought the deal "smelled" is not enough to charge the appellant with knowing that the check was forged; that if he had wanted to pass a "phoney" check he would have engaged in some manipulation to cover his true identity; and that while he "may have smelled a rat" this is not sufficient to show the knowledge which is necessary to support a conviction.

An officer of the bank on which the check was drawn called on Russell as soon as it was discovered that something was wrong. Russell told him that he had received the check in payment of a bill from a client, and refused to tell who the client was. Shortly thereafter, in a conversation with several officers, he told them that he had received the check on a bill from a client, that he had called his client who said the check was good, and that he would tell them nothing further. He said he did not want to divulge the name of his client because the work he had done for his client was not too ethical. Later that same day, in a conversation in the district attorney's office, he told the officers that he would now tell the truth, and that he got the check from Abe Shear in payment for a job he had done for one Morrow; that when he met Shear at the post-office Shear told him he had a check from a "guy" who had lots of money; that this man was then in Arabia or Ethiopia and would never miss the money; that Shear told him to deposit the check in his bank and wait two months "and if there is no protest" they would use the money and split the profit; that when he asked Shear why he did not put it in his own bank account "he said he knew Hight too well to do that; besides Hight was gone anyway"; that he had put a case number (No. 936) on the check just to protect Shear; and that he had never given Shear any of the money. About that time Russell signed a statement which was taken down in shorthand and transcribed. In this statement he said he met Shear while the investigation was in progress and said to him, "Abe, I'm in a hell of a spot along with you. I came from the attorney's. He said it didn't look too good for me"; that Shear replied, "You fathead why did you implicate me?"; that he then told Shear that "I have an out for both of us. . . . I know of a Mex that would state he wrote it if I'd pay him $2,500. Would you loan me some money?"; that Shear

told him "Tell me the name of the fella, and you give me a description of him and I'll back you up"; that he later gave Shear the name of a Mexican and Shear told him to give the man only $800 or $1,000; that Shear said that this man's signature would not match with the endorsement on the check; that he (the appellant) replied, "He can always say his girlfriend wrote it for him"; that Shear said "I'll back you up. I'll identify him, I'll say he was hanging around my place"; and that "I'm trying to get him to admit the check was a forgery when he gave it to me. I know it was forged—but the thing to do is to get him to admit it."

On the witness stand the appellant was asked if he was not suspicious when he was offered half of the check, and he replied that he knew he wasn't to get $400 for nothing. He testified that since he was to get 50 per cent of the check and had done nothing for it "I didn't want to run it through my deposits and made it a separate deposit and never entered it in my bank deposit book." When asked why he had put "No. 936" on the check he explained that this was to indicate a case in his office, that there was no such case, and that "I figured—that if I was ever questioned by Mr. Curtis Hight, I could say 'Well, Mr. Hight, I did an investigation.' " And there was nothing on the check that would tie Mr. Shear into this check at all.

Aside from the testimony of the appellant on the stand there was a mass of evidence which, with the reasonable inferences therefrom, was amply sufficient to show that the appellant knew this check was forged before he passed it. The appellant's testimony on the stand would remove any doubt about his knowledge and criminal intent if any such doubt had otherwise existed. He testified at great length, making many contradictory and inconsistent statements, and his own testimony indicated both that he was not telling the truth and that he knew that this check was forged when he deposited it in the bank; that he believed that he could make this profit without any responsibility being fastened on him; and that he took many steps to that end. The evidence supports the verdict and judgment.

The judgment and order are affirmed.

Griffin, J., and Mussell, J., concurred.